## Wilson Will.

Argued January 6, 1950. Before MAXEY, C. J., DREW, LINN, STERN, STEARNE and JONES, JJ.

reargument refused April 26, 1950.

*Fitzhugh Lee Styles,* for appellant.

*Edward Tolen,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, April 10, 1950:

The Orphans' Court of Philadelphia County declined to enter judgment for proponent *non obstante veredicto* upon a verdict by a jury against the will. This appeal followed.

After an extended hearing before Register of Wills Boland (now a Judge in the Philadelphia Orphans' Court), an issue *devisavit vel non* was granted to determine (a) testamentary capacity of decedent and (b) existence of undue influence. No appeal was taken from such decree. Cf. Act of June 7, 1917, P. L. 415, section 21 (a), 20 PS 2005 et seq. and *Lare Will,* 352 Pa. 323, 42 A. 2d 801. A jury thereafter rendered a verdict against the will. Because of trial errors a new trial was granted and upon a re-trial another jury again found against the will.

Sealie Wilson, the decedent, and most of the witnesses were Negroes. Many of them, including decedent, were persons of limited education. She possessed an estate of approximately $7,000. Decedent's son was her sole heir. The son had three children. The questioned paper was purported to have been signed April 10, 1946. Decedent died July 15, 1946. For some months prior to the death decedent was bedridden and was extremely ill. According to the attending physician she suffered from heart trouble, high blood pressure, edema (i. e. tumor or dropsy), sweating of the legs, enlargement of the liver and other complications. While there is testimony that decedent possessed testamentary capacity, there is also testimony that at times she was delirious, had lapses of memory, was not always clear and coherent, and did not possess testamentary capacity.

The factual issue may be thus stated: Proponent maintains that decedent's son, an alcoholic, neglected his mother in her last illness; decedent's brother, the proponent, at decedent's urgent request, came from his home in Florida and nursed and cared for her until her death. (Proponent had always resided in Florida; his

farm was close to Jacksonville and he had never before been beyond that city.) Proponent contends that because the son neglected his mother and proponent cared for decedent, she properly disinherited the son and grandchildren and devised and bequeathed her estate to proponent who therefore became, in the circumstances, the natural object of decedent's bounty. Contestant, the son, and his witnesses, on the contrary, present a different situation. They concede that from March 2, 1946, until April 10, 1946 (the date of the questioned will) and thereafter until decedent's death, proponent nursed and cared for his sister. It is also admitted that the son was an alcoholic. It was testified by some witnesses for both proponent and contestant that despite the son's weakness, the mother retained a deep affection for the son and his children. Four other wills had been drawn and executed by decedent previous to the questioned document. In the first three wills active trusts were created for the son and the grandchildren. From the date of proponent's arrival in Philadelphia on March 2, 1946, he promptly assumed the management and control of decedent's financial affairs. On April 2, 1946, at *proponent's* direction to the scrivener, a will was drawn and was executed by decedent in which she left proponent the bulk of her estate. (The beneficiaries in the three previous wills had been decedent's son and grandchildren). This will disinherited the son. On April 10, 1946, again, at *proponent's* direction, decedent's lawyer, the scrivener, drew the questioned document wherein the son was bequeathed a bedroom suite and proponent's interest in decedent's estate was increased.

In reviewing this record we experienced difficulty in searching out the pertinent testimony in this poorly tried case. Counsel on both sides should have omitted their unnecessary belligerent attitude and spent more time and attention in intelligently and efficiently developing the facts of the case.

At the inception there is considerable doubt whether the questioned writing was adequately proven under section 2 of the Wills Act of June 7, 1917, P. L. 403, 20 PS 191. The Act provides that a will ". . . shall be proved by the oaths or affirmations of two or more competent witnesses. . . ." The writing contains the purported signature of Sealie Wilson the decedent. The attestation clause is signed by two witnesses Thomas Brown and Juanita Best. These subscribing witnesses certify in the paper that it was: "Signed, sealed, published and declared by the testatrix above named, as and for her last Will and Testament in the presence of us, who have hereunto, at her request subscribed our names in her presence and the presence of each other, as witnesses hereto."

This statement is conceded to be false. Neither subscribing witness saw decedent sign her name nor did the subscribing witnesses sign at the request of decedent and in the presence of each other. Subscribing witness Thomas Brown testified that he did not see decedent sign; that he came in the decedent's room at the request of proponent; that the scrivener Livingston was there and *he* requested the witness to sign; that decedent was lying down in her bed; that decedent was not clear and coherent. Subscribing witness Juanita Best, while at first uncertain, finally declared that it was the *scrivener* who requested her to sign as a witness; the will was read by the *witness* but it was not read to decedent; that as far as the witness knew decedent was of "sound and disposing mind". While both subscribing witnesses testified that they did not sign in the presence of each other, neither could remember whether proponent was in the room when they did sign. Mr. Livingston, the lawyer-scrivener, testified that the *proponent* came to him and gave him directions to prepare the will; that in accordance with such directions he prepared the will and took it to the decedent at her

home and read it to her and that she signed it; that at times decedent had "lapses of memory"; that at the signing, in his opinion, decedent possessed testamentary capacity. The situation, therefore, is: one subscribing witness repudiates while the other subscribing witness affirms, but both certifying in the attestation clause to an untruth. Under these facts, the testimony of the subscribing witness and the attesting witness as to the valid execution of the paper was for the jury. There is real doubt whether or not decedent, though physically in the room, could see, hear, comprehend and approve of what was happening, so that her assent might be inferred. One witness said she was lying down; the other said that decedent was sometimes lying down and at other times sitting on the side of the bed. There is an absence of testimony as to *where* in the room the witnesses signed and whether the decedent did or could have seen them sign, so that her direction might be implied.

We agree with the opinion of the learned court below that standing alone perhaps testamentary incapacity has not been sufficiently established. We observe, however, that no witness testified that decedent possessed a full knowledge of the property she possessed, an intelligent perception and understanding of the disposition she desired to make of it and of the persons and objects she desired to be the recipients of her bounty: *Olshefski's Estate,* 337 Pa. 420, 11 A. 2d 487; *Ash Will,* 351 Pa. 317, 41 A. 2d 620.

But there was ample evidence to support the jury's verdict against the will on the ground of undue influence. Mr. Justice HORACE STERN observed in *Freed's Estate,* 327 Pa. 572, 577, 195 A. 22: "While undue influence is subtle, intangible and merely psychic in its effects, so that its existence cannot be detected, weighed or measured by instruments of science, nevertheless human

experience can . . . recognize it as the causative factor. . . ."

Where evidence may not be sufficient to establish testamentary incapacity, but does show bodily infirmity and weakened mentality, a presumption of undue influence arises where a person standing in a confidential relation is benefited by a will which he has been instrumental in having executed: *Blume v. Hartman,* 115 Pa. 32, 8 A. 219; *Miller's Estate,* 179 Pa. 645, 36 A. 139; 187 Pa. 572, 41 A. 277; *Robinson v. Robinson,* 203 Pa. 400, 53 A. 253; *Goss's Estate,* 274 Pa. 278, 118 A. 26. Cf. *Schwartz's Estate,* 340 Pa. 170, 16 A. 2d 374; *Hollinger Will,* 351 Pa. 364, 41 A. 2d 554; *Quein Will,* 361 Pa. 133, 62 A. 2d 909. A confidential relation exists whenever the relative position of the parties is such that the one has power and means to take advantage of, or exercise undue influnce over, the other: *Stewart Will,* 354 Pa. 288, 47 A. 2d 204; *Dichter Will,* 354 Pa. 444, 47 A. 2d 691, and cases therein cited.

At the time the questioned will was signed, decedent was weak in body and mind. Within the short period of one month from the date of his arrival in Philadelphia, on March 2, 1946, proponent not only became the chief beneficiary by the instrument dated April 2, 1946, which *he* instructed the scrivener to prepare, but on April 10, 1946, eight days thereafter, proponent procured the execution of the will now in question, which increased his share. Proponent also caused his name to be added to decedent's bank account. He became the designated beneficiary in decedent's life insurance policy and those of the son. Proponent had sole care and custody of his sick sister. A confidential relation was clearly shown to exist. Proponent failed to meet and overcome presumption of undue influence.

There are many circumstances indicating actual fraud. Bearing in mind the weakened mental and physical condition of decedent, Mr. Livingston, the scrivener,

testified that decedent understood that she was creating a trust estate for her son and her grandchildren, and that the proponent would ". . . be in the position to take care of [the son and grandchildren]"; that both the scrivener and the decedent had confidence in proponent. Significantly the scrivener testified: "Q. When you explained that to [decedent] she signed the document? A. Yes."

Thus the lawyer testified, in effect, that he explained to his ill and illiterate client that while the form was an absolute bequest to proponent, yet in substance it constituted a trust for her son and her grandchildren. The proponent himself testified that he wanted the will changed to pass to him absolutely because he did not "want the property so complicated" (i. e. in trust for the son and grandchildren). He testified: "Q. Didn't you so testify that you did not want the property so complicated to leave it in trust with you for her son and grandchildren? You did not want it that way? A. I didn't tell Mr. Livingston I didn't want it that way. Q. You did not want it that way? A. I didn't want it that way. Q. You wanted it left to you directly, and you would carry out the trust; is that right? A. That's right." We neither decide nor infer that a trust may be established *by parol* where the devise or bequest is absolute in written terms. But under these circumstances, it was for the jury to determine whether decedent comprehended the effect of what she was doing.

There is also testimony, considered in connection with the foregoing circumstances, which collaterally indicates the existence of actual fraud. Not content with procuring two wills in his favor, and causing decedent's insurance to be transferred to him as beneficiary, and securing joint control over decedent's bank account, proponent demonstrated his acquisitiveness by causing three insurance policies on the son's life to be transferred

to him as beneficiary. There is no testimony to show how or why these designations were made. While they are purported to have been executed by the son, proponent testified that he had not seen the son since he was a "little bit of fellow" and it is not shown that proponent ever saw him again until after decedent's death.

Ample evidence exists to support the verdict of the jury.

Judgment and decree affirmed at the cost of appellant.