McFadden Will.

38

Argued March 1, 1954. Before RHODES, P. J., ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ. (HIRT, J., absent).

*John W. Bour,* with him *Albert P. Leonzi* and *Martin H. Philip,* for appellants.

*Paul A. McGlone,* for appellee.

OPINION BY WOODSIDE, J., October 8, 1954:

We are concerned here with the legal residence of a testatrix at the time of her death and whether an issue devisavit vel non should be framed.

Anna L. McFadden, a spinster, died July 21, 1950 in a nursing home in Scranton, at the age of 74. What purported to be her last will and testament was admitted to probate by the register of wills of Lackawanna County and letters testamentary were granted to Marjorie W. Gleason on August 25, 1950. An appeal was taken from the probate by Anna McFadden Helferty and William P. McFadden, niece and nephew of the decedent, being heirs at law and beneficiaries in the probated will.

The deceased had as her closest living relatives 7 nieces, 7 nephews, 5 grandnieces and 6 grandnephews. Marjorie W. Gleason, a grandniece, was given the residue of the estate and named executrix in the probated document.

The grounds upon which the appeal was taken from the register of wills were: "(1) Lack of probate jurisdiction, in that the domicile of the decedent at the time

of her death was in East Mauch Chunk, Carbon County, this Commonwealth.

"2. Testamentary incapacity and/or undue influence."

Before any testimony was taken Marjorie W. Gleason died and her husband Frank A. Gleason was subsequently issued letters of administration d.b.n. c.t.a. on the estate of Anna L. McFadden and substituted as a party for his late wife in this action.

After extended hearings on the preliminary question of domicile, the court affirmed the jurisdiction of the register of wills holding that the deceased was domiciled in Lackawanna County at the time of her death. The parties thereupon filed a stipulation that the evidence presented at the hearings on domicile and jurisdiction along with the record of probate, without the production of further evidence, be used to determine the question of testamentary incapacity and undue influence.

The court concluded that there was no substantial dispute of a material fact as to the testamentary capacity of the testatrix nor as to undue influence at the time the will was executed and dismissed the appeal.

There are some facts in the case concerning which there is little or no dispute. Anna McFadden was reared in Scranton. When she was a young woman she left there for New York where she served as a waitress in Wanamaker's Tea Room for 25 years. From there she went to Atlantic City where she resided for a number of years. Thereafter for a time she lived with her brother in Philadelphia and in Margate, New Jersey. This brother predeceased her and she inherited from him. Thereafter gradually becoming crippled by arthritis, she spent relatively short periods of time in a number of different nursing homes. There is evi-

dence that during all of her life she returned to Scranton for visits with relatives and referred to that city as "home".

In 1946 she left a nursing home in Philadelphia and went to White's Nursing Home in Scranton. After staying there for a year and a few months she went to East Mauch Chunk in May of 1947. There she resided in an apartment at 315 South Street with a friend.

There can be no doubt that she established a bona fide domicile and residence in East Mauch Chunk in Carbon County. She had her furniture there, her bank account and securities there (except one bank account in Philadelphia), licensed her automobile from that address, filed her income tax returns from that address, had a telephone in her name there, became an active church member there, contacted a funeral director from there concerning her burial, and in other ways left no doubt that East Mauch Chunk was her domicile, and that she, while there, intended it to be such until the time of her death. The trial judge found that she had established a domicile in East Mauch Chunk.

There is no merit to appellee's contention that she was a transient and "at all times . . . she considered Scranton her home and domicile." There cannot be the slightest doubt that from May 1947 to January 1950 East Mauch Chunk, Carbon County was her domicile.

Whether her domicile was in Carbon or Lackawanna County at the time of her death depends on whether or not she transferred from the former to the latter during the six month period immediately prior to her death.

According to the testimony of Frank A. Gleason, while the deceased was in Scranton at White's Nursing Home he visited her about three times a week and his

wife visited her daily. But from the time she went to East Mauch Chunk in May of 1947 until he saw her in the hospital in Allentown in January of 1950 the Gleasons had not seen or heard from her. At Christmastime, 1949, a number of checks were given to relatives by the deceased. The Gleasons were not among those remembered.

There is no indication that the deceased had any mental weakness while residing in Carbon County. She found it difficult to walk because of her arthritis, and she was not in the best of health, but prior to her entry into the Sacred Heart Hospital at Allentown she was not seriously ill.

She was taken to the hospital in Allentown on January 28, 1950. There she was found to be "mentally confused", "not oriented" and "very incoherent." Her physician called in a specialist to determine whether she had a brain tumor. While in the hospital in a very serious condition the Gleasons arranged for her removal by ambulance to the Hahnemann Hospital in Scranton. According to the testimony they visited her at her request made through a nurse who accompanied the deceased to Allentown from East Mauch Chunk. According to Gleason they arranged to transfer her to Scranton upon her request made to them during their visit in Allentown.

When she arrived at the hospital in Scranton on February 1, the Gleason family's physician took over. He found her to be "very seriously ill," suffering from cerebral apoplexy, acute infectious pneumonia, generalized arteriosclerosis and the long standing arthritis. She had a temperature of about 101, and had difficulty in swallowing and talking because of a throat condition believed by the physician to be due to a condition of the brain. But, he says, she was clear of mind, alert and possessed of an excellent memory. He ad-

mitted later that at times she was irrational, but he attributed that to sedatives, and said she was otherwise clear and knew what she wanted.

The physician testified, with the hospital record before him, that her temperature remained up "for a week or two, or maybe a little longer, maybe about three weeks, then the temperature came down" although "the lungs never cleared up completely."

Although the apoplexy paralyzed her one side for a while this condition "later cleared up" although how much "later" is not clear.

When Miss McFadden was brought to Scranton she had an estate in excess of $55,000. On the eighth day she was there she signed a power of attorney giving the Gleasons complete control over all her property. They immediately went to East Mauch Chunk and obtained possession of all her property there including her household furniture, her personal belongings, her bank accounts, her securities and other contents of her safe deposit box and a will which was in possession of a lawyer in Carbon County. Thus the Gleasons, while the deceased was seriously ill with pneumonia, apoplexy and arteriosclerosis, "moved her" from Carbon County to Lackawanna County.

The Gleasons also arranged for the transfer of deceased's account of approximately $30,000 from the North Philadelphia Trust Co. to the Third National Bank of Scranton. Concerning this Gleason testified that when the check was obtained from the Philadelphia bank he took an officer of the Scranton bank to her hospital room and she signed a deposit slip putting the account in the name of herself and Anna Gleason *with the right of survivorship.* Gleason does not remember the banker's name, but knows him when he sees him. Thus did the Gleasons get the bulk of the McFadden Estate. There is evidence that the above

power of attorney was written by counsel for the Gleasons in this case, but there is no evidence as to how it came to be written.

The will in question was executed February 16, fifteen days after the testatrix was transferred to the hospital in Scranton. After bequests of $200 to the church, a 1941 automobile and a wrist watch, two trusts of $5000 each were created for the care of two ill relatives, the residue of these trusts going to Marjorie W. Gleason who was also named residuary legatee and executrix. In addition to the above, $1200 was to be divided among relatives, approximately 20 in number.

Eleanor Nolan, a subscribing witness to the will and a nurse of Miss McFadden was called as a witness by appellee.

She testified that she was called into Miss McFadden's hospital room, sat her up in bed and secured a table for her to write on. Miss McFadden then signed the will after which she and the counsel for appellee signed it as witnesses. She does not remember who else was present in the room at the time. The will was not read to Miss McFadden nor was anything said to her or by her about the will while the witness was present. Miss Nolan testified that on the day the will was signed her patient's mind was clear.

Presumably the will was written by counsel for appellee, but we cannot be sure from the evidence. Counsel did not elect to enlighten us as to how the will came to be written, and what was said about its terms, by whom, and when. Neither do we have his version of its execution.

Where it appears that counsel for the appellee was the scrivener and a subscribing witness to the will and elects to tell us nothing whatsoever about it, this fact must be considered as a material and damaging cir-

cumstance against the proponents. *Appeal of Ulmer,* 9 Sadler 467 (1888).

There were other witnesses who testified that while Miss McFadden was in the hospital at Scranton she was mentally alert. One of these was Kathryn Walsh who testified for appellee that she thought the deceased's mind was "very clear." How "clear" appears from her reply to a question put by appellee's attorney concerning what deceased had said about where she intended to live after leaving the hospital. He undoubtedly expected the answer he ultimately did obtain—that she said she would like to live with the Gleasons. But the witness had more to say. She told of Miss McFadden telling her that when she left the hospital she wished to live with Mary O'Malley—who had been dead for six years at that time and who Miss McFadden had well known was dead. When reminded of the fact Mary was dead she said then she would live with Jim O'Malley, Mary's brother, for "then Jim must have a housekeeper and I would go there." But Jim too had died some years before, and Miss McFadden in days when her mind was clear had known that too, quite well.

The testimony that deceased's mind was "clear" is subject to convincing contradiction.

When deceased "was getting brighter and better", as the physician said, she wished to be removed from the hospital to the White Nursing Home. The Gleasons tried to arrange this but there was no room at the White home. On June 12, 1950 she was taken from the hospital to the Zabada Nursing Home in Lackawanna County where she died July 21, 1950.

There can be no doubt from the facts of this case that a confidential relationship existed between the testatrix and Marjorie W. Gleason during the last six months of the testatrix's life, when her property was

moved from East Mauch Chunk to Scranton, and when the will was executed.

"A confidential relation exists whenever the relative position of the parties is such that the one has power and means to take advantage of, or exercise undue influence over, the other." *Wilson Will*, 364 Pa. 488, 493, 72 A. 2d 561 (1950). "Such a relation may be found inferentially from circumstances as well as from direct proof." *Stewart Will*, 354 Pa. 288, 296, 47 A. 2d 204 (1946).

"Where evidence may not be sufficient to establish testamentary incapacity, but does show bodily infirmity and weakened mentality, a presumption of undue influence arises where a person standing in a confidential relation is benefited by a will which he has been instrumental in having executed." *Wilson Will*, supra, page 493.

Where there is a confidential relationship between the testatrix and the proponent, the burden is upon the proponent to establish affirmatively regularity of conduct and good faith on his part in connection with the execution of the will. *Stewart Will*, supra, page 297.

The lower court did not question the existence of a confidential relationship but was satisfied that "the testimony does not show a weakened intellect."

While in Allentown the testimony shows she was "mentally confused", "not oriented" and "very incoherent." When she arrived in Scranton she was suffering from cerebral apoplexy, acute infectious pneumonia, and generalized arteriosclerosis. If anything her condition was more serious than when she was in Allentown. Any one of these might well result in the mental condition described by her physician at Allentown.

Although the testimony on the duration of the pneumonia and apoplexy is indefinite there is testimony that her temperature continued above normal until a time later than when the will was executed.

There is also the testimony of Kathryn Walsh concerning the confusion of the testatrix.

Although there is ordinarily a presumption of lack of undue influence and the burden is upon the contestant to prove it (*Ross Will*, 355 Pa. 112, 49 A. 2d 392 (1946)), nevertheless if a person "is so *physically infirm or* mentally weak as to be susceptible to undue influence, and a substantial part of his estate is left to one occupying a confidential relation to him, the burden is upon the *latter* to show that no improper influence controlled the making of the will." *May v. Fidelity Trust Co.*, 375 Pa. 135, 149, 99 A. 2d 880 (1953). And this is true even though the person has testamentary capacity, supra.

It is proper to consider whether the disposition made in the will is a natural and reasonable disposition, and in harmony with the family background. *Williams v. McCarroll*, 374 Pa. 281, 97 A. 2d 14 (1953). In this case it may be questioned whether it is natural and reasonable for the deceased to distribute $1200 among 20 of her relatives and tens of thousands of dollars to one whom she did not even have among the relatives remembered by her at Christmas, less than two months before transferring her bank account and making the will.

There is evidence of a weakened intellect in this case as well as evidence of confidential relationship and we think the question of undue influence should be submitted to a jury.

Less clear is the evidence of testamentary incapacity, but under the circumstances of this case we think it too should be submitted to a jury.

On the question of incapacity and undue influence in connection with the execution of the will, the court heard the testimony for the purpose of determining whether there was a substantial dispute of a material fact. On the question of jurisdiction the court heard the testimony as a trier of fact to determine, not whether there was a dispute of fact, but what the fact (of domicile) was.

"If the evidence supports the findings and the findings in turn justify the decree, . . ." it is our duty to affirm the decree whether we would have made the same findings and decree or not. If there is evidence to support the findings we can ignore them only ". . . if it appears from the record that there is a capricious disbelief of evidence . . ." *Pusey's Estate,* 321 Pa. 248, 260, 261, 184 A. 844 (1936).

The lower court found as a fact that the deceased directed her furniture and personal possessions be moved to Scranton, and that she intended to abandon her domicile in East Mauch Chunk, and to acquire a new domicile in Scranton. The court thereupon concluded that the deceased at the time of her death was a domiciliary of Lackawanna County and that the register of wills of that county had probate jurisdiction. We must give these findings the same weight we would give the verdict of a jury. *Pusey's Estate,* supra. Since there is evidence to support such findings we must affirm them.

There is no merit to appellee's contention that we should dismiss the appeal because in the court below appellant did not take exception to the court's findings of fact and decree within 10 days of their entry as provided in a rule adopted by that court in 1941. Where there is a separate Orphans' Court composed of one judge there is no substantial reason for such a rule. A court may waive its own rules and this rule appar-

ently has never been treated as effective by the Orphans' Court of Lackawanna County. In its opinion in *Rose Lewis' Estate,* not reported but found in the paper books of 364 Pa. 225 (1950), that court said: "nor does this court have any rule allowing exceptions to be filed to the refusal of an issue d.v.n."

The decree of the court below is affirmed insofar as it relates to the jurisdiction of the register of wills of Lackawanna County and is reversed insofar as it denies the request for an issue devisavit vel non on the questions of testamentary capacity and undue influence.