**[J-18-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | |
|---|---|
| IN RE:  ESTATE OF ISABEL WILNER, DECEASED<br><br>APPEAL OF:  LINDA BAKER | :  No. 136 MAP 2014<br>:<br>:  Appeal from the Order of the Superior<br>:  Court at No. 1323 MDA 2012 dated<br>:  5/6/14, reversing and remanding the<br>:  order of the Wyoming County Court of<br>:  Common Pleas, Civil Division, at No.<br>:  2011-013 dated 6/25/12 and filed<br>:  6/26/12<br>:<br>:  ARGUED:  May 6, 2015<br>:  RE-SUBMITTED:  January 20, 2016 |

**OPINION**

**CHIEF JUSTICE SAYLOR**[1]                              **DECIDED:  July 19, 2016**

In this appeal by allowance, we consider the meaning and proper application of the statutory two-witness rule for proving a will where the original, executed will is lost.

This dispute arises from an attempt to enter a copy of a lost will into probate. According to the credited testimony and other evidence presented in the orphans' court, Isabel Wilner ("Decedent"), born in 1920, died at age 91 in March 2011.  She was a lifelong Episcopalian and, during her career as a librarian and author of children's books, she lived in or near Baltimore, Maryland, where she attended the Church of the Nativity (the "Maryland church").  She also spent time in Tunkhannock, Pennsylvania,

---

[1] This matter was reassigned to this author.

where she ultimately decided to live during her retirement. While residing in Tunkhannock, Decedent attended Saint Peter's Episcopal Church (the "Pennsylvania church"). She remained on good terms with both churches throughout her life.

Decedent never married. Her intestate heirs were her niece Dana Wilner ("Appellee") and her nephew David Wilner, who is not involved in this litigation.

Charles Welles, Esq., a lawyer in Tunkhannock, drafted a will for Decedent, nominating Decedent's friend Margaret Young as executrix and naming the Maryland church as the primary beneficiary. Decedent executed the will in June 2007. Testamentary formalities took place at the office of another Tunkhannock attorney, Judd Fitze, Esq. The subscribing witnesses were Attorney Welles and Attorney Fitze's secretary. Attorney Fitze was present for the execution and notarized the signatures. Attorney Welles made two conformed copies of the will.[2] He kept one such copy for his files and gave the other copy and the original will to Decedent.

When the will was executed, Decedent, then 87 years old, was suffering from physical limitations which prevented her from ascending the stairs in her home. Additionally, her eyesight was failing. She therefore lived in a first-floor bedroom. Decedent's live-in caregiver was Linda Baker (appellant herein), a close friend and a cousin by marriage. At Decedent's request, Baker put the original will in an unlocked metal box near Decedent's first-floor bedroom. Baker placed the conformed copy in a locked safe in an upstairs bedroom. The key to the safe was kept in the drawer of a nearby night table.

In April 2010, Attorney Welles prepared two additional documents for Decedent: a codicil which specifically referenced the June 2007 will and changed the executrix

---

[2] The conformed copies were photocopies of the will before it was signed. On each signature line for the testatrix and the two subscribing witnesses, Attorney Welles hand-printed the name of the person who signed on that line.

from Young to Baker, and a deed transferring ownership of Decedent's Tunkhannock home to the Pennsylvania church while retaining a life estate. The executed deed was recorded with the county recorder of deeds. As for the codicil, Attorney Welles followed the same procedure as with the will: he made conformed copies, kept one copy for his files, and gave the original and a conformed copy to Decedent. Again, Baker put the executed codicil in the downstairs metal box and placed Decedent's conformed copy in the upstairs safe.[3]

Later that year, in November 2010, several family members visited Decedent at her house. Among them was Appellee, whom Decedent had not invited.[4] During the visit, Appellee told Decedent that if anything were to happen to Decedent, Appellee wanted to have certain family documents and other items in Decedent's possession. Appellee also advised Decedent that she should move out of her house and live in a nursing home. Appellee's presence and remarks caused Decedent to become visibly distressed to the point where Decedent asked not to be left alone with Appellee.[5] Subsequent phone calls from Appellee were also upsetting to Decedent and made it

---

[3] There is no issue before this Court relating to the validity of the codicil or its entry into probate. As discussed below, the codicil is relevant as an evidentiary matter because it references the will.

[4] It appears that Decedent and Appellee had a strained relationship. For example, at one point Appellee stayed at Decedent's home while Decedent was away and removed and copied Decedent's private financial records without her permission. This upset Decedent, who retained Attorney Welles to write to Appellee requesting the return of the records.

[5] After this incident, Baker and her granddaughter helped Decedent prepare a second codicil relating to the distribution of Decedent's personal effects and specifying that any tangible personal property that remained should be sold at auction and the proceeds given to the Maryland church. There is no dispute before this Court concerning the validity of this second codicil or its entry into probate.

difficult for Baker calm her down or keep her calm. As a result, Baker eventually refused to give the phone to Decedent when Appellee called, and Attorney Welles wrote to Appellee requesting that all future communications with Decedent be directed through him.

One week prior to Decedent's death, Attorney Welles met with Decedent at her home. Decedent did not tell him that she wished to revoke her will, either at this meeting or at any other time, although Decedent and Welles had been in regular contact. Likewise, Decedent never informed Baker that she wished to revoke her will.

Decedent died on March 16, 2011. Shortly thereafter, Baker went to Decedent's house to retrieve the will. She discovered that the will had been removed from the downstairs metal box, although other items – including the two original codicils and the envelope that had contained the will – were still there. When Baker checked the upstairs safe, she found that all papers had been removed, including the conformed copy of the will. Baker conducted a thorough search of the home but was unable to locate any of the missing items.

Without the original will, Baker sought to have Attorney Welles' conformed copy of the will, together with the original codicils, entered into probate.[6] When Appellee objected, the register of wills certified the matter to the orphans' court, *see* 20 Pa.C.S. §907 (relating to the certification of records when a dispute arises), whereupon the Office of Attorney General, in its capacity as *parens patriae*, joined the litigation in view of the charitable bequest to the Maryland church. *See* 71 P.S. §732-204(c) (authorizing the Attorney General to intervene in actions involving charitable bequests).

---

[6] Baker is not a beneficiary under the will or the first codicil. Under the second codicil, *see supra* note 5, Baker is given permission to select several items of personal property and she is instructed to have Decedent's final manuscript published.

The court held two evidentiary hearings to determine whether the conformed copy of the will, as produced by Attorney Welles from his files, should be accepted into probate. During the hearings, Attorneys Fitze and Welles testified that they saw Decedent execute the will. However, only the latter was able to testify to the will's contents, stating that the terms appearing in the conformed copy accurately reflected the contents of the original will.

By opinion and order dated June 25, 2012, the court granted Baker's petition, directing that the conformed copy of the will and the original codicils be admitted to probate and that letters testamentary be issued to Baker. In its opinion, the court initially acknowledged that, when an original will in the testator's possession cannot be located, a rebuttable presumption arises that the testator destroyed it with the intent to revoke it. *See Estate of Wilner*, No. 2011-13, *slip op.* at 8-9 (C.P. Wyoming June 25, 2012) (citing *Gardner v. Gardner*, 177 Pa. 218, 35 A. 558 (1896)). Here, however, the court found the proofs sufficient to rebut the presumption. The court noted that the codicils referenced the will, and it generally credited the testimony of Baker and her witnesses. *See id.* at 10-13.[7]

Second, and relevant to this appeal, the court stated that, to probate a copy of a lost will, the will's proponent must adduce proof by two witnesses of its execution and contents. *See id.* at 9 (quoting *Harrison's Estate*, 316 Pa. 15, 16, 173 A. 407, 408 (1934)). Although only one witness (Attorney Welles) was able to testify to the contents of the original will, the court nonetheless determined that this was sufficient under the "unique" circumstances of the case. *Id.* at 10.

---

[7] Appellee questioned this holding in her concise statement of matters complained of on appeal. However, she expressly abandoned the issue during the course of her appeal to the Superior Court. *See* Brief for Appellant, *Estate of Wilner*, 92 A.3d 1201 (Pa. Super. 2014) (No. 1323 MDA 2012), at 15 n.5.

In a published opinion, the Superior Court reversed, concluding that the orphans' court erred in accepting the conformed copy on the testimony of a single witness. *See Estate of Wilner*, 92 A.3d 1201, 1210 (Pa. Super. 2014). Suggesting preliminarily that there was no reason to doubt Attorney Welles' representation that the copy accurately reflected the original will's contents, the court stated it was bound by the two-witness rule as articulated in *Hodgson's Estate*, 270 Pa. 210, 112 A. 778 (1921). In that matter, this Court expressed that, to probate a lost will, there must be proof by two witnesses of due execution and "of the contents, substantially as set forth in the copy offered for probate." *Id.* at 213, 112 A. at 778, *quoted in Estate of Wilner*, 92 A.3d at 1207. In spite of its holding, the intermediate court noted the apparent inequity of the result and suggested that the two-witness rule as applied presently ran counter to its original purpose of honoring the decedent's wishes and preventing fraud. *See Estate of Wilner*, 92 A.3d at 1210 (quoting *Hodgson's Estate*, 270 Pa. at 215, 112 A. at 779). Thus, the intermediate court urged this Court to grant review and "revisit" the rule to ascertain whether a "narrow exception" should apply here. *Id.*

We granted further review to consider the continuing vitality of the two-witness rule and, in particular, whether it properly applies to a will's contents, as opposed to its execution. *See Estate of Wilner*, ___ Pa. ___, 127 A.3d 1286 (2014) (*per curiam*).

Baker argues that the governing statute – the Probate, Estates and Fiduciaries Code (the "Code")[8] – is silent as to the treatment of lost wills, thus suggesting that the General Assembly intended for the judiciary to determine the adequacy of proof relative to such documents. She contends, moreover, that the two-witness rule as applied to a will's contents is best able to serve its underlying purposes when there is another, earlier will, and the law seeks to prevent individuals from falsely claiming that a later will,

---

[8] Act of June 30, 1972, P.L. 508, No. 164 (as amended 20 Pa.C.S. §§101–8815).

benefiting them and now conveniently missing (in its original form, at least), supersedes the existing will. As that situation did not arise here, Baker proffers that application of the two-witness rule in the present circumstances would not promote its objectives.

More particularly, Baker argues that woodenly applying the rule to benefit Appellee would be especially inequitable because, in Baker's view, Appellee may have caused the will to become missing. Thus, according to Baker, even if the two-witness rule is ultimately retained as a general precept, this Court should recognize an exception applicable where (as here) various factors are present such as: the attorney who drafted the will – and who has no financial stake under the will – is able to produce a conformed copy from his files; he is available to testify regarding the authenticity of the copy and the will's execution; there is no suggestion that the testator may have altered the will; codicils are available which reaffirm the will; and there is evidence of estrangement between the testator and the intestate beneficiary. Overall, Baker argues that she presented compelling evidence of the will's contents to the orphans' court. As such, she maintains that the decision of that tribunal, which observed the evidence first-hand, should be sustained.

Appellee responds by noting that the Code specifies that "[a]ll wills" must be "proved by the oaths or affirmations of two competent witnesses," 20 Pa.C.S. §3132, thus refuting Baker's suggestion that it is silent with respect to lost wills. Appellee observes, more generally, that this legislative directive is substantially similar to Section 2 of the Wills Act of 1917, which this Court construed to require proof by two witnesses as to both the execution and the contents of a lost will. *See Hodgson's Estate*, 270 Pa. at 213, 112 A. at 778 ("Under the [1917] act, to establish a lost will, there must be proof by two witnesses, not only of due execution, but of the contents, substantially as set forth in the copy offered for probate."); *Harrison's Estate*, 316 Pa. at 18, 173 A. at 408

(same). In this respect, Appellee's core position is that, since this particular legislative mandate was not changed with the promulgation of the Code, its interpretation cannot properly be altered at this juncture absent further guidance from the Legislature.

Appellee additionally criticizes the orphans' court for acknowledging the two-witness rule but failing to apply it. She likewise takes issue with the Superior Court's decision to invite this Court to consider an exception to what, in her view, is a legislative command and not a principle of common law. Finally, Appellee rejects Baker's argument to the extent Baker implies that Appellee was involved in the loss of the will, stating that such a suggestion lacks evidentiary support and any issue predicated on an accusation along those lines is waived.

The Commonwealth takes no position on whether the two-witness rule for a lost will's contents should apply here. It does, however, maintain that any exception to the rule which we adopt to account for the equities of this case will be difficult to "cabin" to the present circumstances, Brief for Commonwealth at 14, and will tend to expand over time. *See id.* at 21. Accordingly, the Commonwealth urges us to "proceed with caution" so as to ensure clarity and predictability as to future applications. *Id.* at 25.

We agree with Appellee that the issue before this Court centers on the proper interpretation of statutory law – namely, the Code. Whether the Code requires that two witnesses testify to the contents of a lost will is an issue of statutory interpretation over which our review is plenary and *de novo*. *See Del. Cnty. v. First Union Corp.*, 605 Pa. 547, 556, 992 A.2d 112, 118 (2010).

The portion of the Code most centrally implicated in this dispute is Section 3132, which provides, in full:

> All wills shall be proved by the oaths or affirmations of two competent witnesses and

**(1) Will signed by testator.**--In the case of a will to which the testator signed his name, proof by subscribing witnesses, if there are such, shall be preferred to the extent that they are readily available, and proof of the signature of the testator shall be preferred to proof of the signature of a subscribing witness.

**(2) Will signed by mark or by another.**--In the case of a will signed by mark or by another in behalf of the testator, the proof must be by subscribing witnesses, except to the extent that the register is satisfied that such proof cannot be adduced by the exercise of reasonable diligence. In that event other proof of the execution of the will, including proof of the subscribers' signatures, may be accepted, and proof of the signature of a witness who has subscribed to an attestation clause shall be prima facie proof that the facts recited in the attestation clause are true.

20 Pa.C.S. §3132.

In considering the above, we initially agree with Appellee that Section 3132 applies to lost wills, as it states that "[a]ll wills shall be proved by the oaths or affirmations of two competent witnesses[.]" *Id.* The phrase "all wills" logically subsumes lost wills given the ordinary meaning of the word "all." *See* 1 Pa.C.S. § 1903(a) (directing that words and phrases should generally be construed according to common usage). The concurrence would apparently interpret "all wills" to mean "all wills except lost wills" because, in its view, "the remaining provisions of the Code . . . do not address lost wills[.]" Concurring Opinion, *slip op.* at 2 n.2. This Court has explained, however, that universal, all-inclusive statutory terms, stated without any exceptions, encompass every category of the item in view. *See PennDOT v. Taylor*, 576 Pa. 622, 630, 841 A.2d 108, 112 (2004). Here, the Code's repeated use of such terms, *see, e.g.*, 20 Pa.C.S. §2502 (specifying that "[e]very will shall be in writing"); *id.* §2506 (relating to the manner of revival of "any will" that was previously revoked); *id.* §2515 (governing the means by which a bequest in "a will" may be made to a trust), suggests that it was intended to govern all types of wills, including lost ones. *See generally Lynnbrook & Woodbrook Assocs., L.P. v. Borough of Millersville*, 600 Pa. 108, 115, 963 A.2d 1261,

1265 (2008) (explaining that, when statutory language is clear, it is dispositive and there is no need for further interpretation).

By the concurrence's reasoning, even where the contents of a lost will are adequately proved in court, the Code's chapter governing wills – with all of its regulatory provisions – would have no application solely because the will had been lost. Such provisions cover matters pertaining to, *inter alia*, revocation, modification, rules of interpretation, bequests to trusts, the abolition of devices of estates in fee tail, the alienage of the testator, testamentary guardians, and clauses imposing a penalty for contesting a will. We find it unlikely that the General Assembly intended for all of these measures to have no governance over duly established lost wills. Finally, and as set forth above, the Code also includes the two-witness proof mandate, and it would seem especially incongruous to read the statute as subjecting available wills to this rule while imposing no requirement at all in relation to the proof of lost wills.

Thus, given that all wills, including lost ones, must be proved by two competent witnesses, the next question is what the Legislature meant by "proved." A review of paragraphs (1) and (2) above – which elaborate upon the preceding directive that all wills must be proved by two witness – reveals that they are principally concerned with signature requirements and evidence that the signature (or mark) at the end of the will is genuine. They do not appear to contemplate the contents of a will, lost or otherwise. As well, such focus upon the validity of the signatures is consistent with the specialized term, to "prove" a will, as applied in the probate context.

By way of background, wills can transfer property using a variety of words and phrases, including informal or colloquial ones. *See, e.g.*, *Harmon v. Moss*, 342 S.W.2d 528, 528 (Ky. 1961). By contrast, and for several reasons, formal testamentary procedures must be followed in the execution of a will. As one commentator has

observed, for example, individuals are often careless in conversation and informal writings about the disposition of their property, and, as such, testamentary formalities serve a "ritual function" which "precludes the possibility that the testator was acting in a casual or haphazard fashion." Ashbel G. Gulliver & Catherine J. Tilson, *Classification of Gratuitous Transfers*, 51 YALE L.J. 1, 3, 5-6 (1941). Another adds that conformance with such formalities also serves a "channeling function" because courts are "seldom left to puzzle whether the document was meant to be a will," and hence, they can more efficiently handle a large number of estates. John H. Langbein, *Substantial Compliance with the Wills Act*, 88 HARV. L. REV. 489, 494 (1975).

In light of considerations such as these, and in the specialized context of probate, the phrase, to "prove a will," is a term of art which broadly addresses the need to verify that the writing in question is, in fact, a valid testamentary instrument. The requirement that two witnesses attest to the validity of the testator's signature arises from this broader objective. *See In re Wilson's Estate*, 364 Pa. 488, 491, 72 A.2d 561, 562 (1950) (applying Section 2 of the Wills Act of 1917 in this manner). *See generally* Brief for Commonwealth at 16-17 (tracing the historic roots of the requirement that wills be signed and that two witnesses verify the testamentary character of the document). Moreover, such proof – *i.e.*, that the proffered will is a lawful testamentary writing – is a necessary prerequisite for the will's entrance into probate, *see, e.g.*, *In re Ritchie's Estate*, 480 Pa. 57, 68, 389 A.2d 83, 89 (1978), and it is independent of any dispute that may arise concerning the will's specific bequests and other terms.

Indeed, outside the context of a will that has been lost, stolen, or accidentally destroyed, there is no need to prove a will's terms, as the court is in possession of the original document. *See generally* AM. BAR ASS'N, GUIDE TO WILLS & ESTATES 315 (2d ed. 2004). Additionally, in many cases it will be unlikely that anyone besides the testator

and the drafting attorney is aware of the contents of the will. In this regard, it is notable that at the time of execution, subscribing witnesses need not read a will, *see In re Lawrence's Estate*, 286 Pa. 58, 63, 132 A. 786, 788 (1926); JESSE DUKEMINIER & STANLEY M. JOHANSON, WILLS, TRUSTS, & ESTATES 225 (5th ed. 1995) ("It is neither necessary nor customary for the witnesses to know the terms of the will."), and more, they need not even know that the document is a will. *See In re Lillibridge's Estate*, 221 Pa. 5, 6, 69 A. 1121, 1121 (1908). This is true for multiple reasons, including that: there is no need for such knowledge by the witnesses for them to fulfill their role in confirming the validity of the testator's signature; and prior to death, the testator may not wish to divulge the terms of the will to anyone other than his or her attorney. Finally, it is unlikely that a disinterested witness – such as an attorney's secretary or paralegal – would be able to recall the document's contents in any event given the amount of time which may pass between execution and death and the large number of wills such persons may witness over time.

The above particularized and limited meaning of "proving" a will is evident in the statutes of other jurisdictions. In California, for example, a will may be "proved" by the testimony of a subscribing witness that the will "was executed" in accordance with law, CAL. PROB. CODE §8220(a), or, if no subscribing witness is available, by proof of the handwriting of the testator and the handwriting of any one subscribing witness. *See id.* §8221(a). Likewise, Washington State's statute relating to the "proof of wills," *see* WASH. REV. CODE §11.20.020; *cf. id.* §11.20.040, has been confirmed as pertaining only to the proof of the validity of a will's execution, and not to its contents. *See In re Neubert's Estate*, 369 P.2d 838, 843 (Wash. 1962). Further, some state legislatures, in an effort to provide guidance in cases of lost wills, have set forth rules directed to that circumstance. *See, e.g.*, CAL. PROB. CODE §8223; N.Y. SURR. CT. PROC. ACT §1407;

OHIO REV. CODE §2107.26; TEX. ESTATES CODE §256.156; WASH. REV. CODE §11.20.070; WYO. STAT. §2-6-207.

Even to the extent the word, "prove," as used in Section 3132, may be ambiguous, application of statutory-construction precepts suggests that the more limited, technical meaning of the term outlined above was intended by the General Assembly. For example, we assume that the Legislature does not intend an unreasonable result. *See* 1 Pa.C.S. §1922(1); *Vitac Corp. v. WCAB (Rozanc)*, 578 Pa. 574, 581, 854 A.2d 481, 485 (2004). Because the statutory text does not distinguish between lost wills and original wills which are available for probate, our interpretation of the scope of the two-witness rule will apply equally to lost wills and original, executed wills. Therefore, if we were to conclude that the statute requires proof by two witnesses of the contents of lost wills, the statute would necessarily also require proof by two witnesses of the contents of available wills. This, in turn, would mean that, whenever two witnesses familiar with a will's contents cannot be found, the testator's wishes would be defeated notwithstanding that the original, executed will is available for probate and two witnesses are present who can testify to its validity. This would constitute an unreasonable result. Notably, as well, there was nothing in the 1917 act which suggested that the two-witness rule applied to a will's contents *only* when it was lost. Thus, the same concern with regard to unreasonable results would have pertained in that context, albeit the Court in *Hodgson's Estate* – a decision by which the Superior Court considered itself bound and on which Appellee heavily relies – did not appear to recognize the difficulty. Accordingly, we now disapprove *Hodgson's Estate*'s suggestion

that the two-witness rule was intended by the Legislature to apply to a lost will's contents.[9]

Another principle of statutory construction is that legislative words are to be read in their context and not in isolation. *See O'Rourke v. Commonwealth*, 566 Pa. 161, 173, 778 A.2d 1194, 1201 (2001). In this respect, it is notable that the Code's provision governing proof of a will is immediately followed by a section relating to "self-proved" wills. *See* 20 Pa.C.S. §3132.1. Under that provision, an attested will is made self-proved through the attachment of a testator's acknowledgement and witness affidavits confirming that each witness signed the will freely and voluntarily. *See* 20 Pa.C.S. §3132.1(b). As explained, these witnesses are not assumed to know anything about the will's terms. That their affidavits can nonetheless render a will "self-proved" thus supports the concept that the General Assembly did not contemplate the *contents* of a will when it set out requirements for "proving" a will within Section 3132.

We acknowledge another, countervailing principle of statutory construction: that when this Court has construed legislative language, "the General Assembly in subsequent statutes on the same subject matter [is presumed to] intend[] the same construction to be placed upon such language." 1 Pa.C.S. §1922(4). As applied here,

---

[9] Although there is language in *Hodgson's Estate* suggesting reasons why the two-witness rule as to a lost will's contents may be salutary in terms of preventing fraud, *see* Concurring Opinion, *slip op.* at 3 (quoting the relevant passage), the holding itself was grounded on the Court's understanding of the requirements contained in the 1917 act. *See Hodgson's Estate*, 270 Pa. at 215, 122 A. at 779 ("[W]hen offered for probate, the will, or its substance, must measure up to the requirements fixed by laws; and here the Legislature has laid its hand on the subject and directed the judicial course."). In this regard, although the concurrence criticizes us for not considering such language binding for purposes of the present dispute, its own position – that Section 3132 does not apply to lost wills – represents at least as great a departure from *Hodgson's Estate* since the Court determined that Section 2 of the Wills Act of 1917, a materially identical provision, was applicable to the copy of the lost will offered for probate in that dispute.

this would suggest that, in enacting Section 3132 of the Code, the Legislature intended to incorporate the meaning given to similar language appearing in the earlier wills statutes – and, in particular, it intended for the application of the two-witness rule set forth in *Hodgson's Estate* to carry over into the Code. However, we find that the factors developed above pertaining to the clarification offered by Section 3132.1 of the Code and the avoidance of unreasonable results outweigh, or rebut, any such presumption.

Accordingly, we hold that, while Section 3132 of the Code applies to lost wills, it only governs the "proving" of a will in the narrow, technical sense of proving its validity as a testamentary document, and not to proving its contents.

Still, if a will has been lost, its contents must be proved in some way. In view of the foregoing, the General Assembly has, by design or inadvertence, left it to the judiciary to address proof of a lost will's contents through its own evidentiary requirements. As this case demonstrates, requiring the testimony of two witnesses relative to the terms of a lost will – or otherwise imposing overly burdensome proof requirements – can unnecessarily frustrate the decedent's wishes, particularly where a photocopy or a conformed copy is available. *See* Charles M. Davis, Comment, *A Lost Will, A Photocopy of the Original, and Two "Snakes in the Grass": Is it Time to Update Section 85 of the Texas Probate Code?*, 40 TEX. TECH. L. REV. 89, 91 (2007) (suggesting that failure to admit a photocopy of a lost will could "go against the [testator's] last wishes" and "potential[ly] reward nefarious behavior"); *cf.* Brief for Appellant at 19 ("The sound judgment of an Orphans' Court judge weighing the evidence . . . offers more protection against fraud than a bright line presumption that creates an incentive for [disappointed heirs] to cause that will to go missing.").[10]

---

[10] We offer no opinion on whether Appellee may have caused the loss of the will. That question is not before us, and there is nothing in the record tending to show how the will (continued…)

Overall, then, and in light of the varying ways in which the terms of a lost will may be susceptible of proof, we believe that flexibility is required, and hence, that it is appropriate for this Court to establish an evidentiary *standard* rather than mandating a particular *manner* of proof – at least until the General Assembly speaks to the topic. A review of the requirements embodied in lost-will statutes enacted in other jurisdictions reflects that some such jurisdictions allow the terms of a lost will to be established in any lawful manner by clear and convincing evidence. *See, e.g.*, KAN. STAT. §59-2228; OHIO REV. CODE §2107.26; WASH. REV. CODE §11.20.070(2).[11]

We believe this represents an appropriate standard of proof. *See generally Commonwealth v. Maldonado*, 576 Pa. 101, 109, 838 A.2d 710, 715 (2003) (explaining that the clear-and-convincing standard "requires evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue" (internal quotation marks, citations, and brackets omitted)).[12] As applied here, a fair reading of the orphans'

---

(…continued)
became lost. With that said, we do acknowledge that the potential for fraud is an appropriate concern in developing legal rules applicable to lost wills.

[11] Some other jurisdictions require either two witnesses or one witness plus a copy of the will. *See, e.g.*, ARK. CODE §28-40-302(1); ARIZ. REV. STAT. §14-3415(B), (C); FLA. STAT. §733.207. Still others allow a copy of the will to be introduced and either provide that the copy suffices so long as it is proved to be complete, *see* N.Y. SURR. CT. PROC. ACT §1407(3), or state more generally that "the court shall determine what probative value, if any, is to be assigned to such copy." OKLA. STAT. tit. 58, §82.

[12] Arguing that we have failed to clarify why the clear-and-convincing standard should be deemed "chief among [the listed legislative] rivals," Concurring Opinion, *slip op.* at 6; *see supra* note 11, the concurrence overlooks the explanation given above.

As to any implication that the standard is unduly weak, *see* Concurring Opinion, *slip op.* at 8, we note that in the civil arena, rights and obligations are ordinarily determined based on a fair preponderance of the evidence – at least insofar as monetary interests (continued…)

court's opinion reveals that it found this standard to be met by the proofs adduced in court in relation to the contents of Decedent's 2007 will, as it credited the testimony of Attorney Welles who indicated that the conformed copy offered for probate was a photocopy of the original will in all respects except the signatures.

Accordingly, the order of the Superior Court is reversed and the case is remanded for reinstatement of the orphans' court's order.

Justices Baer, Donohue, Dougherty and Wecht join the opinion.

Justice Todd files a concurring opinion.

---

(…continued)

are concerned – and, as such, the clear-and-convincing requirement is elevated over and above that which would ordinarily pertain in relation to the disposition of property. Moreover, the Supreme Court has clarified that, outside of the criminal context, the requirement of clear and convincing evidence is constitutionally adequate in proceedings involving important individual interests, such as where the government seeks to terminate parental rights involuntarily. *See Santosky v. Kramer*, 455 U.S. 745, 756-69, 102 S. Ct. 1388, 1396-1403 (1982); *see also Commonwealth v. Williams*, 557 Pa. 285, 307, 733 A.2d 593, 605 (1999) (expressing that the clear-and-convincing standard is appropriate even when interests "more substantial than the mere loss of money" are involved (internal quotation marks and citations omitted)). We view this elevated standard as sufficient to satisfy the concurrence's legitimate concerns regarding the need for substantial reliability relative to testamentary bequests. *See generally* Concurring Opinion, *slip op.* at 6-7.