564 A.2d 978

In re ESTATE OF Lucia A. MAMMANA.

**Appeal of Angelina HARDIN, Patrick Mammana, Minnie King, Carmella Borowski and Lucy Snyder.**

Superior Court of Pennsylvania.

Argued June 21, 1989.

Filed Oct. 2, 1989.

14

Thomas F. Traud, Jr., Allentown, for appellants.

Raymond J. DeRaymond, Easton, for participating parties.

Before McEWEN, POPOVICH and MELINSON, JJ.

POPOVICH, Judge:

This case involves an appeal from the final decree of the Court of Common Pleas of Northampton County, Orphans' Court Division, admitting the signed copy of the last will executed by the decedent (Lucia A. Mammana) on November 4, 1968, to probate. We affirm in a case of first impression.

A review of the testimony proffered reveals that in October of 1967, Lucia A. Mammana, in the company of her two daughters (Carmella Borowski and Josephine Yeisley) and son (Frank Mammana), was transported to the legal offices of Coffin, Grifo and DeRaymond. There, the then Attorney Richard D. Grifo, now a member of the judiciary of the Court of Common Pleas of Northampton County, interviewed Mrs. Mammana with regard to the preparation of a will.

A will was written in 1967 for Mrs. Mammana. However, it was never executed. It was not until Grifo contacted Carmella Borowski that he wished to be paid for his services and resolve the status of her mother's intentions as to a will that Mrs. Mammana returned to Grifo's office in the company of the same three children and drafted a new will

(dated November 4, 1968) identical to the first (1967) document in that it left a farm of approximately 135 acres to Frank Mammana, but altered the residuary clause to read that the remaining estate was to be divided among her other six children instead of just to Josephine Yeisley and Carmella Borowski.

During both sessions with Mrs. Mammana, Grifo came away with the impression that the testatrix was "completely aware" of the nature of the conversations and she was cognizant of what she wanted and desired as to the disposition of her estate, as well as to the "objects of her bounty". The witness had "no doubt" in his mind that Mrs. Mammana "knew exactly what she wanted to do with her property, and did it."

Also, Grifo recollected that Mrs. Mammana wanted her son Frank to have the farm, but she did not want him to sell it because of her attachment to it. So, it was Mrs. Mammana's choice to put a time period within which he could not sell it—five years after her death.

The 1968 will was signed by the decedent (on November 4th) and witnessed by Grifo and two of his office secretaries (Anita DiBona and Catherine Wilson). The original will was placed into the office safe.

Sometime in August of 1984, after Grifo was elevated to the bench, his former law partner George Coffin was attempting to determine which wills (both originals and copies thereof) in the office were either of deceased individuals or were no longer effective because of subsequent wills written for that person. Toward that end, the secretarial staff aided Coffin in preparing a list of wills, their date of execution and the scrivener. Once this had been accomplished, and in particular as to the case of Lucia Mammana's will, Judge Grifo was forwarded a "batch" of wills to examine and then was to advise Coffin which wills were no longer worth keeping. In compliance therewith, Judge Grifo returned the 1968 Mammana will to Coffin's office believing, erroneously, that it belonged to someone who had since died. This was noted on the list of wills prepared by

Coffin's legal secretary for Judge Grifo by the use of an asterisk next to Lucia Mammana's name indicating: "Deceased per RDG 8/23/84". This list was returned to Coffin's office along with the original will of Mrs. Mammana.

In Coffin's efforts to up-date the office records with regard to wills, he discarded or destroyed the original 1968 Mammana will. It was only with Mrs. Mammana's death on January 16, 1987, that a copy of the 1968 will, kept by the successor law firm to Coffin, Grifo and DeRaymond, was presented to the Orphans' Court for probate.

After a 4–day non-jury trial, the court entered findings of fact and conclusions of law leading to the admission of the copy of the lost original 1968 will of Mrs. Mammana to probate as a valid testamentary disposition of her estate. Exceptions to the court's *decree nisi* were filed, denied and followed with the entry of a final decree upholding its initial adjudication. This appeal ensued and challenges the lower court's action on two grounds framed in the appellants' brief at page 3 thusly:

  A. Was the ... copy of an alleged Will correctly admitted to probate since the original Will could not be found.[1]

  B. Was the document admitted to probate procured by fraud and undue influence?

Before addressing the resolution of the first issue posed, it is worth noting that:

There are few problems facing the parties and the court having to do with the administration and distribution of decedents' estates that are more difficult of solution than those arising out of various facts affecting lost wills.

Anno., Sufficiency of Evidence That Will Was Not Accessible To Testator For Destruction, In Proceeding To Establish Lost Will, 86 A.L.R.3d 980, § 2[b] at 983–84 (1978), quoting

---

1. The appellants allege in the deleted section of the issue reproduced that the copy of the 1968 will was "unsigned". Our review of the record indicates otherwise in that it was executed by the decedent and witnessed by three individuals. See Proponent's Exhibit No. 4 & Record No. 28.

*O'Neill's Estate,* 58 Pa.D. & C. 351, 359 (1946). None-theless, in this area of the law, it is well-established that:

> When a will is known to have been executed by the decedent and cannot be located after her death and no other will is found, the lost instrument can be probated if: (1) the presumption that the testator revoked the lost instrument is rebutted; and (2) proof is given of both the execution and of the contents of the missing document.

Aker, Law of Wills in Pennsylvania, Section 1.10A. In this Commonwealth, the proof necessary to permit the submission of a copy of a will destroyed by one other than the decedent has been articulated by Mr. Justice Benjamin R. Jones in *Murray Will,* 404 Pa. 120, 129 & n. 12, 171 A.2d 171, 175 & n. 12 (1961) as follows:

> Certain proof is essential to establish a destroyed or suppressed will:[12] (1) that testatrix duly and properly executed the original will; (2) that the contents of the executed will were substantially as appears on the copy of the will presented for probate; (3) that, when testatrix died, the will remained undestroyed or unrevoked by her: *Michelle v. Low,* 213 Pa. 526, 63 A. 246.

---

[12] That is, "destroyed" or "suppressed" by some one other than the testa[trix].

See also *In re Estate of Keiser,* 385 Pa.Super. 24, 560 A.2d 148 (1989).[2] The instant record clearly establishes that the decedent duly and properly executed her will on November 4, 1968, in the presence of Grifo and his two legal secretaries. And, the contents of the will were substantially as set forth in the copy of the will as probated. This was proven through the testimony of Anita L. DeBona, employed at the Coffin law firm in November of 1968, who testified to signing the decedent's 1968 will as a witness and that the copy of the will offered for probate (which had the decedent's signature) was "a true and correct copy of the

---

**2.** We would note that *Keiser* does not discount the first-impression status of the present case because instantly the will was lost while in the possession of the scrivener of the will, whereas in *Keiser* the decedent was in possession of the original will which could not be found upon the decedent's death and an unsigned, unwitnessed, and undated copy was probated in its stead.

final will that [she] prepared on behalf of Lucia Mammana[.]" Further, on the question of the execution of the 1968 will by Mrs. Mammana, Judge Grifo (the scrivener) stated he "recall[ed] ..., absolutely, ... her signing this will in [his] presence" and the presence of Mrs. DeBona and Catherine C. Wilson, the secretaries in the law office at the time.

Next, turning to the status of the 1968 will when the decedent died, *i.e.*, whether it remained undestroyed or unrevoked by her, the record is supportive of a finding that the original 1968 will was inadvertently "destroyed". by someone other than the testatrix under the mistaken belief that she was deceased.

In 1972, Attorney DeRaymond, a former partner in the Coffin law firm, was hired by Mrs. Mammana to handle some legal matters. In the course thereof, it was learned that she did not have a copy of her 1968 will. To remedy the matter, Attorney DeRaymond satisfied himself that the original will was still in the office safe and made Mrs. Mammana a copy of it.

Additional testimony appears in the record buttressing the finding by the court below that the original 1968 will was never in the possession of the decedent so as to raise the presumption that, because of the will's absence, it was revoked or destroyed by the testatrix. See *Murray Will,* supra. For instance, Melanie J. Huff, employed at the law office of George Coffin, gave deposition testimony to preparing a list of wills for the office in 1982. She found the original will of the decedent "in the safe" kept at the office, and, thereafter, placed a check mark next to the decedent's name to indicate possession of the original will by the law firm.

In 1984, a second list of wills was prepared by Mr. Coffin's secretary and sent to Judge Grifo. On this second list appeared the initials of Grifo and an asterisk next to Mammana's name indicating that she was deceased as of August 23, 1984.

This second list was prepared by Jeanne Weinsteiger in August of 1984 and the asterisk appearing next to Mammana's name, which was placed there by the witness, indicated, as already stated, that someone had reported to the witness that such person was deceased. As mentioned by the witness, if Mammana's original will had not existed, it would not have appeared on this list prepared for the then Attorney Grifo for his perusal. Moreover, Weinsteiger was "certain" that she "actually physically had in her hands in 1984, the will of Lucia Mammana."

Ruth I. McGovern, another secretary at the Coffin office, confirmed that the check mark next to the Mammana name was to indicate that the law firm had the "original" will as of 1984. This witness also remembered seeing the will of the decedent in the office safe and in Coffin's office. The witness gave her accounting in the following fashion:

> And the reason I did, is because I came from Cape Cod, and we never saw names like you have down here, Dutch-type names and whatnot. And I saw that name Mammana, and I never heard of it before, and I remember looking at it. I just remember that name.

On cross-examination, the witness was firm in her resolve of seeing the decedent's will in 1984; to-wit:

[Attorney for the appellants:]

Q. ... are you sure that the will you saw in this cardboard box [in Coffin's office] was Lucia Mammana's ... [?]

A. Yes. Because, I remember the name Lucia. I always liked that particular name. And that name, coupled with the Mammana name, I was not familiar with it, and liked it.

Q. And you know that that was in this cardboard box around Christmas of '84?

A. Ah-ha.

Q. And do you think it was there for sometime after that?

A. Yes. I think it was still there during 1985?

Q. But at some point, it was no longer there?

A. Right.

From the evidence presented, there is ample proof upon which to hold that the "original" 1968 will was never in the possession of the decedent prior to her death, and that it was "destroyed" or discarded by Attorney Coffin (or someone on his behalf) in an effort to "clean out" office documents that were no longer necessary to retain.

■ Accordingly, we do not find persuasive the argument of the appellants that the retention of the original will by the attorney for the decedent is not enough to rebut the presumption that a lost will is thought to be revoked or rescinded by its author. Rather, we find that if a will is lost while in the hands of one other than the decedent, it is presumed that the person who had possession of it lost the document. See *Thompson v. Dobbs*, 234 S.W.2d 939 (Tex. Civ.App.1950). Thus, we have no dispute with the tenet in the law that the failure to find a will, after a careful and exhaustive search, raises a presumption that the decedent destroyed it with the intent to revoke it. *Murray Will*, supra. However, such a presumption is rebutted by proof that after the execution of the will, it was deposited by the testator or testatrix with a custodian (in this case, an attorney) and that the decedent did not thereafter have it in his/her possession or have access to it. See *In re Pinney's Will*, 72 N.Y.S.2d 895 (1947).

■ In the instant case there was satisfactory evidence to show that the testatrix never had possession of the original document nor access to it. Therefore, the lost will cannot be presumed to be destroyed by the testatrix. *Id.* See also *Estate of Yost*, 117 So.2d 753 (Fla.App.1960); *Bohnson's Will*, 203 Misc. 116, 115 N.Y.S.2d 147 (1951); *Condon's Estate*, 124 Misc. 845, 208 N.Y.S. 797 (1925); *Gfroerer v. Gfroerer*, 173 Ind. 424, 90 N.E. 757 (1910). As such, the presumption of the lost 1968 will being revoked or destroyed by the testatrix; so as to foreclose a submission

of a copy for probate, is to take a myopic view of the law and the facts at bar. This we will not do.

The copy of the decedent's 1968 will is held to have been admitted properly for probate by the Orphans' Court.

■ Lastly, to the appellants' contention that fraud and undue influence were perpetrated upon the decedent by Frank Mammana to secure his inheritance of the 135–acre farm, we find that the record does not establish a basis for any such conclusion.

We have the testimony of the scrivener of the 1968 will that Mrs. Mammana was a "very strong woman in good health, and active" during the time of the drafting of the will in question. See *In re Estate of Agostini*, 311 Pa.Super. 233, 244, 457 A.2d 861, 867 (1983) (Popovich, J.) (Period during the execution of the will is crucial to decide whether testatrix was unduly influenced). He also stated that the testatrix was aware of the substance of his conversation with her concerning the manner in which she proposed to dispose of the bulk of her estate to her son, Frank, and that she was aware of what she wanted and desired to do with her property in giving the farm to her son.

Even more enlightening is the testimony of the daughter, Josephine Yeisley, who would stand to profit (from a larger share of her mother's estate) if the copy of the 1968 will were invalidated. Yet, she admitted on the stand that:

> The thing is it was she [decedent] wanted [Frank] to have the farm, and Carmella and [the witness] to distribute ... the rest with the other children.

And, this intention of the decedent was "indicated" by Lucia to Grifo, so stated Yeisley. This witness also remarked that her mother "knew" what she was doing at the time and was in good mental and physical health. Further, neither sister present at Grifo's office during the 1968 will discussion voiced an objection to the mother's intended disposition of the farm to Frank.

Suffice it to say, our review of the record fails to establish any evidence of fraud or undue influence being en-

gaged in by Frank so as to justify a revocation of the copy of the 1968 will. Accordingly, we will join in the court's allowance of the copy of the 1968 will to be probated.

Order affirmed.

MELINSON, J., concurs in the result.