**ESTATE OF Isabel WILNER, Deceased.**

**Appeal of Dana Wilner, Appellant.**

Superior Court of Pennsylvania.

Submitted May 21, 2013.
Filed May 6, 2014.

---

James F. Mannion, King of Prussia, for appellant.

Sandra D. Boyle, Nicholson and C.H. Welles, IV, Scranton, for Baker, appellee.

Sean A. Kirkpatrick, Office of Attorney General, Harrisburg, for Charities, appellee.

BEFORE: FORD ELLIOTT, P.J.E., PANELLA and PLATT,* JJ.

OPINION BY FORD ELLIOTT, P.J.E.:

Appellant, Dana Wilner, comes before us appealing the granting of a petition to probate a copy of a lost will of her aunt, Isabel Wilner, the deceased. Finding that the copy was not supported by sufficient proof to permit probate, we are constrained to reverse.

The procedural and factual summary found in the trial court's opinion accurately reflects the assembled record and we adopt it as our own:

Isabel Wilner (hereinafter "Decedent"), a resident of Tunkhannock, Wyoming County, died on March 16, 2011, at the age of ninety-one (91). On May 5, 2011 Linda Baker filed a Petition requesting the probate of a conformed copy of a Will dated June 29, 2007, together with an original codicil dated April 26, 2010. Pursuant to the copy of Decedent's June 29, 2007 Will and the original April 26, 2010 Codicil, the Church of Nativity of Baltimore is the primary beneficiary.

The matter was certified by the Wyoming County Register of Wills to this

---

* Retired Senior Judge assigned to the Superior Court.

Court pursuant to 20 Pa.C.S.A. § 907 and the matter proceeded to an evidentiary hearing on June 29, 2011. At the hearing, the Petition was opposed by Dana Wilner, Decedent's niece and an intestate heir who would receive one-half of the estate[Footnote 2] if Ms. Baker's Petition were denied.

At the hearing Charles Welles, Esquire testified that he prepared both the June 29, 2007 Will and April 26, 2010 Codicil for Decedent. (H.T. 6/29/11, p. 5). Attorney Welles further testified that his customary practice when presenting wills to his clients is to make three copies, with the client signing one and the other two bearing the names and dates of the people who signed them but not bearing actual signatures. (H.T. 6/29/11, p. 6). The original and one conformed copy are provided to the client with Attorney Welles retaining the other conformed copy. (H.T. 6/29/11, p. 6).

Attorney Welles testified to the content of the Will, which was executed by Decedent on June 29, 2007 at the law offices of Attorney Judd Fitze, Tunkhannock, Wyoming County. (H.T. 6/29/11, pp. 8, 18). Decedent's signing of the Will was witnessed by Andrea Hebda, a secretary in Attorney Fitze's office, Attorney Welles and it was notarized by Attorney Fitze. (H.T. 6/29/11, p. 9). Decedent was provided with the original and one conformed copy. Attorney Welles filed a conformed copy with the Wyoming County Register of Wills and retained a copy for his own records. (H.T. 6/29/11, pp. 9, 19–20).

Several years later, Decedent approached Attorney Welles to prepare a Codicil to her original will. Said Codicil was executed by Decedent on April 26, 2010 for the purpose of changing the executrix named in Decedent's June 29, 2007 Will from Margaret Young to Linda Baker,[Footnote 3] Decedent's caregiver, a cousin by marriage and a close friend. (H.T. 6/29/11, pp. 10, 37). Decedent's signing of the Codicil was witnessed by Attorney Welles and Linda Baker. (H.T. 6/29/11, p. 10). The original and a conformed copy were provided to Decedent with Attorney Welles retaining a conformed copy for his records. (H.T. 6/29/11, p. 11).

At or around the same time that Attorney Welles prepared Decedent's Codicil, Attorney Welles also prepared a Deed reflecting Decedent's desire to transfer her home to St. Peters Church retaining a Life Estate in same. (H.T. 6/29/11, pp. 11–2). Said Deed was executed on April 26, 2010 and recorded in the Wyoming County Recorder of Deeds Office on May 11, 2010 with an instrument number of 2010–411G1. One week prior to her death, Attorney Welles was asked to go to Decedent's home to give her communion[Footnote 4] and at no time did Decedent ever inform Attorney Welles that she wished to revoke her Original June 29, 2007 Will. (H.T. 6/29/11, p. 16).

Attorney Judd Fitze testified that often times out of town counsel utilize his conference room, as was the case with Attorney Welles and his client, Isabel Wilner, on June 29, 2007. (H.T. 6/29/11, p. 27). Attorney Fitze testified that as soon as Isabel Wilner [sic] walked into his office, he knew her, as they were neighbors from Attorney Fitze's youth. (H.T. 6/29/11, p. 28). Although Attorney Fitze notarized the Will, he testified that he did not read the Will, rather he simply witnessed the Decedent sign her name to the same. (H.T. 6/29/11, pp. 28, 30–1).

Andrea Hebda, secretary to Attorney Judd Fitze, testified that she could only vaguely remember Attorney Welles bringing the Decedent to the conference room of Attorney Fitze's offices to exe-

cute a will. (H.T. 6/29/11, pp. 33, 35). Ms. Hebda further testified that although she witnessed Isabel Wilner sign the will, she did not read the will, nor could she recall any discussions surrounding the will. (H.T. 6/29/11, p. 35).

Linda Baker, Decedent's caregiver, testified that she resided with Decedent and was present at Decedent's home when she arrived home from her meeting with Attorney Welles on June 29, 2007. (H.T. 6/29/11, p. 37). Upon request of the Decedent, Ms. Baker placed the conformed copy of the will in Decedent's safe under her bed upstairs, locked the safe and placed the key in the bedside stand. (H.T. 6/29/11, pp. 38, 43). The original will was placed in Decedent's unlocked metal box under her desk in the downstairs living room, where Decedent[']s hospital bed was located. (H.T. 6/29/11, p. 38).

Ms. Baker was present when Decedent executed the Codicil on April 26, 2010. (H.T. 6/29/11, p. 39). The original codicil was also placed in the unlocked metal box under Decedent's desk in the downstairs living room and the conformed copy was placed in the locked safe upstairs under Decedent's bed. (H.T. 6/29/11, p. 40). Ms. Baker was with the Decedent at the time of her death and at no time leading up to her death did the Decedent inform Ms. Baker that she wished to revoke her will. (H.T. 6/29/11, p. 41).

Decedent did not have access to the safe on the second floor, as she was not capable of climbing the steps. Decedent did have access to the unlocked metal box located downstairs in her living room. (H.T. 6/29/11, pp. 43, 47). However, Ms. Baker testified that Decedent was almost totally blind and as such, if she needed any documentation out of either the metal box or the safe, she would ask Ms. Baker for assistance. (H.T. 6/29/11, pp. 43–4). At no time

prior to her death did Decedent request Ms. Baker to retrieve the documents in question.

After Isabel Wilner's death, Ms. Baker opened the metal box to find the original will missing. (H.T. 6/29/11, pp. 42, 48). The envelope for the will together with the original codicil, insurance papers, a power of attorney and a do not resuscitate letter were in the box but the original will was missing. (H.T. 6/29/11, pp. 42, 47). Thereafter, Ms. Baker checked the locked safe upstairs to find that no documents were there. (H.T. 6/29/11, pp. 42–3). Also missing from the upstairs safe were copies of Decedent's father's and mother's death certificates, letters from Decedent's brother and her brother's Purple Heart. (H.T. 6/29/11, pp. 51–2). Ms. Baker searched the entire home for the original will and missing items from the safe, to no avail.

Following the hearing on June 29, 2011 the record was closed. However, on or about September 30, 2011, Linda Baker filed a Petition to Probate a Second Codicil and to Open the Record. Oral argument was held regarding reopening the record. During argument, counsel for Linda Baker represented to this Court that Linda Baker was in possession of a second Codicil dated January 15, 2011 and of a series of correspondence between Decedent, her niece, Dana Wilner, and Attorney Welles. Despite objection from counsel for Dana Wilner[Footnote 5] and in the interest of preserving the Decedent's desires for her property upon her death, the Court reopened the record and a second evidentiary hearing was held on December 20, 2011.

At the second evidentiary hearing, Linda Baker testified that sometime in November 2010, after Decedent had executed her Will and placed the original in

an unlocked box in her living room, several family members came to visit the Decedent and that Dana Wilner, who was not invited by Decedent, showed up. (H.T. 12/20/11, pp. 3–4, 74). This uninvited visit from Dana Wilner upset Decedent for several reasons including, but not limited to, Dana making reference to wanting particular items from Decedent's home upon her death and instructing Decedent that she should be residing in a nursing home. (H.T. 12/20/11, pp. 4, 7, 25–30). Decedent was shaking and crying and repeatedly requested that Ms. Baker not leave Decedent alone with Dana Wilner. (H.T. 12/20/11, pp. 27, 31). Following Dana's visit, she phone[d] the Decedent several times. (H.T. 12/20/11, pp. 12, 41–2). Decedent became so upset after said phone calls that Ms. Baker refused to put Decedent on the phone and contacted Attorney Welles to instruct him to notify Dana Wilner that any contact for Decedent should go through Attorney Welles. (H.T. 12/20/11, p. 12, 41–2).

As evidenced by the Second Codicil to Decedent's will, sometime following the visit from Dana Wilner, Decedent and Linda Baker began making a list of specific personalty items in Decedent's home and where Decedent desired said items to go upon her death. (H.T. 12/20/11, pp. 8–11, 32–35). In fact, during her life, Decedent instructed Linda Baker and Ms. Baker began to separate said items and prepare to ship the items to the respective recipients. (H.T. 12/20/11, p. 11). The original January 15, 2011 Codicil was typed by Ms. Baker's granddaughter, executed by Decedent, witnessed by Ms. Baker and her granddaughter and placed in the unlocked metal box in the living room. (H.T. 12/20/11, pp. 9, 37).

Attorney Charles Welles testified that he first began representing Decedent in late 2006 or early 2007 when Decedent contacted him indicating she was missing documents, namely bank statements, a key collection, address book, scissors and a binder containing medical information. (H.T. 12/20/11, p. 49). Decedent believed her niece, Dana Wilner, had taken said documents because Dana Wilner and her brother stayed in Decedent's home for approximately one (1) month while Decedent was in a rehabilitation center and nursing home. (H.T. 12/20/11, pp. 49–50, Pet. Ex. 2). As a result, Attorney Welles sent a letter to Dana Wilner requesting she return said items. (H.T. 12/20/11, p. 51, Pet. Ex. 3). Dana Wilner responded to the letter on February 24, 2007 stating that she had the financial information but that she did not have the other items. (H.T. 12/20/11, pp. 51–2, 71, Pet. Ex. 4). Attorney Welles was called upon again in January or February of 2011 to send a letter to Dana Wilner requesting that if Dana needed to contact Decedent that said contact be made through Attorney Welles. (H.T. 12/20/11, p. 53, Pet. Ex. 6).

Dana Wilner, who did not appear for the first evidentiary hearing, testified at the second hearing that she had no knowledge of Decedent's will or any codicils thereto. (H.T. 12/20/11, p. 78). She further testified that when she removed the financial documents in late 2006 or early 2007 she did not have permission. (H.T. 12/20/11, p. 81). In response to the letter from Attorney Welles addressing same, Dana Wilner wrote a letter to Decedent, which reflected that the relationship between Dana and Decedent was sometimes strained. (H.T. 12/20/11, p. 83, Pet. Ex. 5). Lastly and perhaps most telling, Dana Wilner testified that

she did not attend her Aunt's memorial service. (H.T. 12/20/11, p. 84).

> [Footnote 1] Decedent's Estate is estimated to be valued at approximately two hundred sixty thousand dollars ($260,000.00) together with tangible personalty household goods. (H.T. 6/29/11, pp. 14–5, 22).
> [Footnote 2] David Wilner, Decedent's nephew, would receive the other half of Decedent's estate. (H.T. 6/29/11, p. 14).
> [Footnote 3] Linda Baker has no financial interest in the Decedent's Estate as a beneficiary. (H.T. 6/29/11, pp. 24, 44).
> [Footnote 4] Attorney Welles is authorized by his church to give communion to individuals that are homebound. (H.T. 6/29/11, p. 16).
> [Footnote 5] Counsel for Dana Wilner agreed to stipulate to the January 15, 2011 document. (H.T. 8/17/11 p. 12).

Trial court opinion, 6/27/12 at 1–8.

Appellant initially asserted two issues in her statement of errors complained of on appeal:

1. Whether the Trial Court erred in finding that the presumption of revocation of the "lost" Will dated June 29, 2007 was rebutted?

2. Whether the Trial Court erred in finding that the unsigned copy of the "lost" Will dated June 29, 2007 was entitled to be probated, despite that there was proof of contents of that document by only one witness, contrary to the "two-witness" rule?

Concise Statement of Errors Complained of on Appeal Pursuant to Pa. R.A.P. 1925(b), 8/3/12. On appeal, appellant has chosen not to pursue her first issue, believing that her second issue, pertaining to the "two-witness" rule, requires reversal. (Appellant's brief at 15, n. 5.) Thus, we deem that issued to be abandoned and waived.

█ We begin our analysis of appellant's remaining issue with our standard of review:

> When an appellant challenges a decree entered by the Orphans' Court, our standard of review "requires that we be deferential to the findings of the Orphans' Court." *In re Estate of Miller,*

18 A.3d 1163, 1169 (Pa.Super.2011) (*en banc* ).

> [We] must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. Where the rules of law on which the court relied are palpably wrong or clearly inapplicable, we will reverse the court's decree.

*Id.* (alterations and citation omitted).

*In re Estate of Brown,* 30 A.3d 1200, 1206 (Pa.Super.2011).

Our case law has long required the oath or affirmation of two witnesses to prove both the execution and contents of a lost Will:

> [The witnesses'] testimony was effective for but one purpose, and a very important purpose. It proved a will had been duly exec[u]ted. There was no other evidence offered tending to establish the contents, nor was any memorandum produced for this purpose from any other person than the scrivener, and, assuming decedent identified the will by calling it the Riddle (that being the scrivener's name) will, still there is a fatal hiatus in the evidence which avoids bringing it within Wills Act of 1833 (P.L. p. 249) § 6, re-enacted in section 2 of the Wills Act of June 7, 1917 (P.L. 405; Pa. St. 1920, § 8308), requiring the contents of a lost will to be proved by the oath or affirmation of two or more competent witnesses; otherwise the will shall have no effect. ***Under the act, to establish a lost will, there must be proof by two***

*witnesses, not only of due execution, but of the contents, substantially as set forth in the copy offered for probate.* Proof of a lost will is made out only by proof of execution and of contents, by two witnesses, 'each of whom must separately depose to all the facts necessary to complete the chain of evidence, so that no link in it may depend on the credibility of but one.'

*In re Hodgson's Estate,* 270 Pa. 210, 212–213, 112 A. 778 (1921) (some citations omitted) (emphasis added).[1]

The *Hodgson's* court also related why this rule exists:

Still, when offered for probate, the will, or its substance, must measure up to the requirements fixed by laws; and here the Legislature has laid its hand on the subject and directed the judicial course. It has been wisely done. The two-witness rule is sound. By permitting one witness to establish the contents of a lost will, the door would be opened to intriguing and designing persons, after which misfortune must necessarily follow; and while, by such latter rule, a disappointed heir may be discouraged from destroying a will, dishonesty, fraud, and criminal wrong would be greatly encouraged. If a will, properly executed, is lost, and the one-witness rule should prevail, it would permit a scrivener to write the will after his own fashion, diverting the estate into channels never dreamed of by the testator, disinheriting heirs, and denying to those close to him throughout life the benefit of his bounty. Where two witnesses to the contents are required, the opportunity for ingrafting bogus wills on estates, or for dishonesty in scriveners who write wills, or other fraud in connection therewith, if not made impossible, is greatly lessened.

*Id.,* 270 Pa. at 215, 112 A. at 779.

■ At the hearing below, appellees presented only one witness, scrivener Charles H. Welles, IV, Esq., as to the contents of the Will proposed for probate. Instantly, appellees,[2] as well as the court below, put forward various arguments to avoid the longstanding requirement of a second witness to prove a lost will. Based on the state of the law, we can find none of them to be persuasive.

Attorney Welles testified that the three will documents presented to the decedent consisted of an original and two unsigned and unsworn photocopies. (Notes of testimony, 6/29/11 at 20.) Appellees attach a talismanic quality to the fact that the document presented is a photocopy, attempting to paint the two-witness rule as a relic of an antiquated past. Appellees seem to believe that a photocopy of the will represents proof certain that the original will contained those exact provisions and presents the exact intentions of the decedent. While it is true that a photocopy will certainly more accurately depict the original

---

1. Appellees attempt to distinguish *Hodgson's Estate,* arguing that the case was resolved upon a failure of proof as to execution rather than proof as to contents. (Appellees' brief at 17.) Appellees' argument includes this alleged quotation from *Hodgson's Estate:* "Whether the contents were proven by two witnesses, appellant and the stenographer who made the copy for her, is open to question. We need not determine this since proof of execution fails." The quoted language actually belongs to another case, *In re Harrison's Estate,* 316 Pa. 15, 19, 173 A. 407, 409 (1934). While *Harrison's Estate* may have been resolved upon a failure of proof as to execution, *Hodgson's Estate* was most assuredly decided upon a failure of proof of *contents* by two witnesses.

2. We include in this group the Commonwealth of Pennsylvania whose Attorney General has filed an *amicus* brief in support of appellees Linda Baker and the Estate of Isabel Wilner.

will than a handwritten copy, and vastly more so than the faded memory of a witness to an event long past, the question still remains whether a document put forward is, in fact, a photocopy of an original will.

Only Attorney Welles was able to identify the document presented below as a photocopy of the original will. Although we find no reason to question Attorney Welles' testimony, the fact remains that we are bound by the two witness rule.[3] In an ideal situation, if a second witness had been able to identify the document put forward as a photocopy of the original signed will, we could confidently be assured that the document represented the *exact* desires of the decedent. Nonetheless, the advent of photocopying adds nothing to deflect the purposes of the rule and our requirement for strict adherence.

Appellees cite *Estate of Del Rossi,* 23 Pa.D. & C.4th 218 (Montgomery County, 1995), in support of their position. In *Del Rossi,* the court of common pleas permitted a photocopy of a *fully executed* lost will to be entered into probate without the support of two witnesses. The signatures on the photocopy had all been authenticated. While this case is not binding on us, we nevertheless note that *Del Rossi* is distinct from the instant case because the photocopy propounded here was a conformed copy and did not bear actual signatures that could be authenticated. We do not today address the situation where a photocopy of a fully executed lost will is submitted for probate without the support of two witnesses.

Next, citing 20 Pa.C.S.A. § 2502, appellees argue that the two-witness rule should no longer apply because Pennsylvania stat-utes no longer require two witnesses for the execution of a valid will. While this may be true, our statutes still require the oath or affirmation of two witnesses to *prove* a will before it may be probated. *See* 20 Pa.C.S.A. § 3132. The proving of a will merely authenticates the testator's signature on the will. Thus, this is no basis to abandon the two-witness rule for lost wills.

■ Next, appellees argue that there is no reason to apply the two-witness rule because the presumption of revocation has been rebutted (and such contention *contra* has been abandoned by appellant on appeal). This in no way obviates the need to apply the two-witness rule as it applies to a separate inquiry:

> When a will is known to have been executed by the decedent and cannot be located after her death and no other will is found, the lost instrument can be probated if: (1) the presumption that the testator revoked the lost instrument is rebutted; and (2) proof is given of both the execution and of the contents of the missing document.

*In re Estate of Mammana,* 388 Pa.Super. 12, 564 A.2d 978, 980 (1989), *appeal denied,* 525 Pa. 635, 578 A.2d 929 (1990), quoting Aker, Law of Wills in Pennsylvania, Section 1.10A. Successfully rebutting the presumption of revocation only satisfies the first requirement listed above; proof as to execution and contents remains unsatisfied.

■ Finally, appellees and the trial court attach great importance to a second codicil to the will below which, it is asserted, mirrors the testamentary devises of the original will, setting out various be-

---

**3.** The purpose of the two witness rule is to prevent some unscrupulous scrivener or some other party from preparing a counterfeit will, photocopying it, and presenting it to the court as a photocopy of the original lost will. It would seem a document presented as a photocopy would in no way lessen the possibility of fraud. This is particularly true when the signature page is separate from the disposition pages.

quests and then leaving the residue of the estate to the Church of the Nativity in Baltimore, Maryland.[4] Appellees and the court contend that the second codicil effectively stands in the place of a second witness. We disagree.

■ First, the second codicil may not be admitted to probate. A will is defined by statute as "a written will, codicil or other testamentary writing." 20 Pa.C.S.A. § 102. Thus, a codicil must meet the same statutory requirements as a will. Therefore, the second codicil may only be admitted to probate if the decedent's signature thereon is supported by the oath or affirmation of two witnesses. There are no witnesses' signatures and acknowledgement on the codicil itself and it is not self-proving. *See* 20 Pa.C.S.A. § 3132.1. Therefore, in order to allow the second codicil into probate, the appellees needed to provide the testimony of two witnesses to prove decedent's signature. Only one witness, Linda Baker, identified the decedent's signature. Baker testified that an unidentified granddaughter of hers typed the codicil and also witnessed the signing, but Baker's granddaughter was not called to testify and identify the signature. Nor was Attorney Welles called to identify the signature of the decedent on the codicil. Thus, the codicil was not supported by the oath or affirmation of two witnesses and should not have been admitted to probate.

■ To the extent that appellees and the trial court both assert that appellant "stipulated" to the codicil, we do not find that the stipulation was to admit the codicil to probate. When Linda Baker sought to re-open the record to bring in the second codicil, it was initially opposed by appellant. Ultimately, during the hearing to re-open the record, appellant stipulated that the second codicil could be entered into the record. (Notes of testimony, 8/17/11 at 11.) However, this was only a stipulation that the second codicil could be introduced into the record at a subsequent hearing on whether it could be admitted into probate. It manifestly was not a stipulation that the second codicil could be entered into probate or that the second codicil was in any way valid. Indeed, immediately after entering the stipulation, counsel for appellant stated, "[W]e're willing to stipulate just to this document being admitted *being allowed to then argue for what they mean in the context of the other issues.*" (*Id.* at 11–12 (emphasis added).) Counsel then specifically referenced the two-witness rule. (*Id.* at 12.)

Furthermore, at the close of the subsequent December 20, 2011 hearing on admission to probate, the court directed counsel to file briefs outlining their positions. (Notes of testimony, 12/20/11 at 89–90.) In the brief subsequently filed by appellant, appellant specifically argued that the second codicil could not be entered into probate because only one witness was offered to prove it. (*See* Record Document No. 20, Post Trial Brief of Dana Wilner in Opposition to Petition to Probate a Conformed Copy of the June 29, 2007 Will, filed 2/3/12 at page 10.) Clearly, appellant never stipulated that the second codicil could be entered into probate.

Second, even if admissible into probate, the second codicil does not mirror the proposed will in leaving the residue of the estate to the Church of the Nativity. The second codicil makes several specific devises and then concludes, "Everything left should be sold at auction, and the proceeds given as directed in my Will to The Church of Nativity, Cedarcroft, Md."[5] As appel-

---

**4.** A legitimate first codicil was also presented. Unfortunately, its only provision was to change the executor of the will and offers no insight as to the contents of the original will.

**5.** The document appears to be referring to Cedarcroft Road located in Baltimore; our atlas reveals that the Church of the Nativity is located on Cedarcroft Road.

lant indicates, while this would include all remaining personalty, it would not include bank accounts which obviously would not be sold at auction. Most of the value of the decedent's estate here is comprised of three bank accounts amounting in the aggregate to almost a quarter of a million dollars. Thus, the second codicil does not purport to bequeath the residue of the estate.

Accordingly, having found that the two-witness rule controls, and was not satisfied below as to the proposed will or proof of the second codicil, we will reverse the order granting appellee Linda Baker's petition and accepting the proffered will for probate.

Before concluding, we must protest that while our decision today follows the law, we are stricken with the pervasive sense that it does not do justice. Just as the two-witness rule was crafted to prevent "intriguing and designing persons" from "diverting the estate into channels never dreamed of by the testator, disinheriting heirs, and denying to those close to him throughout life the benefit of his bounty," we believe that today, the rigidity of the two-witness rule has accomplished precisely that. Therefore, should allowance of appeal be sought before our supreme court from our decision, we respectfully urge that body to accept appeal and revisit the two-witness rule to determine whether a narrow exception is not appropriate here.

Indeed, we believe that under the narrow circumstances of this case, an appropriate exception could be carved out. The trial court found that the testatrix did not destroy the original will, that the photocopy of the will represented the testatrix's intent, and that credibility issues should be resolved in favor of appellees regarding the probating of the will. Most importantly, neither Attorney Welles nor Linda Baker received any interest whatsoever under the will, nor was there any evidence of any other motive for Attorney Welles to put forward a false document. The beneficiary of the entire residuary proceeds of the will put forward was a charitable taker. The two-witness rule seems designed to prevent unscrupulous persons from coming forward with a lost will in which they receive the lion's share of its benefit. It is impossible to believe that that situation obtains instantly where the lost will is being put forward by an individual who received nothing and a charity everything. Unfortunately, we do not have the ability to modify the rulings of our supreme court, but we can invite that body to review this matter.

Order reversed. Case remanded. Jurisdiction relinquished.